David Graulich, Esq. (SBN 260515)
LAW PRACTICE OF DAVID GRAULICH
P.O. Box 2041
Fair Oaks, CA 95628
Telephone: 916-966-9600
david@wrongedatwork.com

Attorney for Plaintiff
Aisling Cannon

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AISLING CANNON,<br><br>        Plaintiff,<br><br>   v.<br><br>WELLPATH MANAGEMENT, INC.<br><br>        Defendant | Case No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>1.  California Labor Code § 1102.5 (Whistleblower Protection)<br><br>2. California Health & Safety Code § 1278.5<br><br>3. Wrongful Termination in Violation of Public Policy<br><br>4. Intentional Infliction of Emotional Distress<br><br>Demand for Jury Trial |

## I. PARTIES

1. Plaintiff Aisling Cannon ["Plaintiff"] was employed as a nurse in the County Jail, City of Placerville, El Dorado County, California. At all relevant times, Plaintiff was a resident of El Dorado County.

2. Defendant Wellpath Management, Inc. ["Defendant"] operates medical and health services for inmates in jails and prisons across the United States, including the Placerville Jail where Plaintiff was employed.

## II. JURISDICTION AND VENUE

3. This is an action in diversity pursuant to 28 U.S.C. § 1332(a). Plaintiff is a resident of California and a citizen of the United States. Defendant is a Delaware corporation with headquarters in Nashville, Tennessee. The company is registered with the California Secretary of State as Wellpath Management, Inc., entity No. C3521984.

4. Plaintiff has a good faith belief that the amount-in-controversy is in excess of $75,000. This is an action for wrongful termination in violation of public policy. Plaintiff's total annual compensation in 2018, including salary and benefits, was approximately $93,000.

5. Venue is proper in this Court. Defendant is subject to the personal jurisdiction of this Court because Defendant maintains facilities and business operations in this District. All or most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

### III. FACTUAL BACKGROUND

6. Plaintiff is a Licensed Vocational Nurse (LVN) whose specialty is providing health care to incarcerated populations. She previously worked in Folsom State Prison in Folsom, California. She accepted a job at El Dorado County jail in Placerville, CA in March 2008.

7. Plaintiff worked a twelve-hour overnight shift beginning at 7 p.m. and finishing at 7 a.m. Her work week started on Tuesday evening and ended on Saturday morning. With rare exceptions, she was the only nurse at the jail during her shift from 10 p.m. through 7 a.m.

8. When she began working in Placerville, Plaintiff was employed by a private company, California Forensic Medical Group, Inc.(CFMG), which had its main office on 2511 Garden Road, Suite A160, Monterey, CA.  Plaintiff was an at-will employee and was not represented by a collective bargaining unit.

9. Subsequent to a series of corporate mergers, CFMG did business under the name Correct Care Solutions and, in 2018, was renamed Wellpath. Headquartered in Nashville, Tennessee. Wellpath is a privately-held company with annual sales estimated at $1.5 billion.

10. The following text appears on the company's Web site:

> Wellpath provides our local government partners with a staffed managed care model that implements comprehensive, accredited medical and behavioral healthcare programs and services that include off-site hospital contracting and dental. Our goals, on behalf of our local detention clients, are to improve patient care and clinical quality, reduce cost, mitigate risk of malpractice and

litigation, and increase stabilization and operational efficiencies in county jails and other local facilities. (www.wellpathcare.com)

11. During her first seven years of employment at the jail, Plaintiff received favorable performance reviews signed by her supervisor, Gina Olson.

12. Plaintiff did not receive a review during her last four years of employment, ending in 2019. Her personnel file had two more recent reviews that were partially completed. Plaintiff never saw these incomplete reviews while employed.[1] There are no signatures on the documents, although the handwriting in the comments section appears to be that of Gina Olson. The boxes that are checked, showing Plaintiff's performance in various categories, have lower scores than Plaintiff had regularly achieved.

### *Installation of a New Medical Records System*

13. In 2018, Placerville County began to convert its jail to a new computer system, which dramatically changed the way the County collected, stored, archived and accessed prisoners' medical information. These digital records are known as "electronic medical records," or EMR.

14. The EMR conversion took place during 2018 and 2019. The vendor was CorEMR of Orem, Utah. According to the company's Website, "CorEMR began in 2004 as an electronic medical records company that facilitates the organization of medical systems within correctional facilities electronically. Our all-

---

[1] Following her termination in May 2019, Plaintiff requested her personnel file from Wellpath. Her first request, mailed on July 12, 2019, went unanswered. Her second request, sent by certified mail on August 29, 2019, resulted in her receiving her personnel file from a Wellpath HR staffer in San Diego.

encompassing program was built specifically for correctional facilities." The company claims to be "the fastest-growing EMR company in corrections." (www.coremr.com)

15. The company's Web site further states: "We take pride in the fact that we offer the most comprehensive system that will save you and your medical staff substantial amounts of time, while significantly decreasing the chances of dangerous and costly misreporting errors."

16. At Placerville Jail, the new EMR system was plagued with problems. Documents would disappear mid-task from one nurse's computer and re-appear on a different computer. Orders for medication would be entered and never show up again. Freezes and crashes were commonplace.

17. Plaintiff was candid, persistent and outspoken in her criticisms of the new EMR system. She frequently called management's attention to the flaws and malfunctions. Plaintiff complained of the EMR problems and system malfunctions to Gina Olson; Christina (Tina) Nevarez, Program Manager, and Michelle Bianchi, Nursing Supervisor.

18. Plaintiff repeatedly warned that the new CorEMR system could readily be "hacked" by unauthorized parties. Plaintiff further warned that the privacy and confidentiality of prisoners' medical information could be violated.

19. Plaintiff repeatedly warned management that the flawed computer system was creating mistakes that appeared at first as human errors, but in fact were

caused by a poorly-designed system, flawed technology and a lack of quality control.

20. The response to Plaintiff's warnings was one of indifference and complacency: a new system tended to be "buggy," things weren't that bad, and everybody just had to adapt and get used to the new system. On May 24, 2018, Olson sent an email to staffers that said, in part: "CorEMR is new for all of us and I want to say what a great job everyone is doing with the change over. Change is Change and not always the easiest."

21. Even *before* the CorEMR installation, data security at the jail was questionable. On June 29, 2017, Plaintiff was one of several dozen recipients of a brief message from Gina Olson:

> Subject: Hacked
> Hi All – I was hacked. I have CMCG IT working on fixing it. Don't open Drop Box email. Thank you – Gina

### *Medication Error on the Second Floor*

22. The Placerville Jail has two floors of cells connected by a staircase. The second floor was known as "top tier." To dispense pills on the top tier, nurses need to prepare medications in advance, a process known as "pre-pouring."

23. Pre-pouring is disfavored in the nursing profession, as it increases the risks for medication errors. Plaintiff had expressed concerns many times about the risks involved with pre-pouring at the Placerville Jail.

24. Not only was staff instructed to pre-pour all top tier medications, but staff was also instructed to pre-pour as soon as the shift began. This practice created a large window of eight or more hours until medications would be administered to inmates. This was because that medication delivery to cells did not take place until the last part of a 12-hour shift.

25. Plaintiff was instructed to pre-pour medication for top-tier inmates in yellow envelopes, with each inmate's name handwritten on the envelope. Plaintiff asked management on multiple occasions to place each inmate's photograph on his or her envelope, to ensure that the correct inmate received the correct medication at the correct time with the correct dosage.

26. Plaintiff was informed by Gina Olsen that "Placerville Jail, unlike Tahoe Jail[2] did not have the time nor the manpower to create such envelopes."

27. Plaintiff administered medication to a top-tier inmate, John Doe.[3] Mr. Doe received a prescription medication, Atarax, which is similar to Benadryl, an over-the-counter antihistamine. However, on this particular evening, Plaintiff discovered that she didn't have a pre-pour of Atarax as she distributed medications at Mr. Doe's cell.

28. Plaintiff advised Mr. Doe that she would note the missing pill and look into the discrepancy further.

---

[2] Tahoe Jail, a sister facility in El Dorado County, followed the practice of putting inmate photographs on the envelopes.
[3] A pseudonym is used to protect the inmate's privacy.

29. Mr. Doe filed a grievance, complaining that Plaintiff never came back and he did not receive his medication.

30. Plaintiff was shocked when this incident resulted in a severe form of discipline. More than a month after this incident occurred, on April 27, 2019, she received a "Final Written Warning" that was postured as a corrective action resulting from Mr. Doe's missing pill. Plaintiff had received no preliminary warnings, either regarding pre-poured medications nor any other work-related conduct. The severe discipline was disproportionate to what had really occurred.

***Mystery Pill in Office: March- April 2019***

31. In March 2019, Plaintiff's supervisor, Tina Nevarez, arrived unexpectedly at the start of Plaintiff's shift. Nevarez said she wanted to interview Plaintiff regarding a mystery pill.

32. The nurses' office has two desks. One desk, near the medication closet, is used exclusively by nurses. The second desk is used by correction officers when they are working in the nurses' office.

33. A single prescription pill was found in the nurses' office during day shift. The pill was on the desk used by officers.

34. The pill was identified as clonazepam (generic name), which is sold under the brand name Klonopin. The medication is an anticonvulsant or antiepileptic drug, typically prescribed to prevent and control seizures. It is also used to treat panic attacks and is a scheduled narcotic.

35. Placerville Jail kept its supply of clonazepam in a locked safe. However, the pill found on the officers' desk was not the brand kept in stock (i.e., it was from a different pharmaceutical manufacturer). The pill found on the desk had to have been brought into the Jail from outside.

36. Plaintiff was asked if she knew anything about this pill, if it was brought in by her, or by someone she knew. Plaintiff denied having any knowledge of the found pill.

37. Plaintiff was asked to identify what personnel had entered the office during the previous night shift. Plaintiff told Nevarez that numerous officers had been in and out of the office, due to a violent and disruptive inmate who was brought to the medical department. Plaintiff didn't recall, or know, the names of all of the officers who were involved. Plaintiff said she had no knowledge of how the clonazepam pill had been left on the desk.

38. Nevarez warned Plaintiff not to discuss this matter with co-workers, because "you never know if someone is trying to set you up." Plaintiff did not understand Nevarez's remark.

39. The next night shift, when Plaintiff reported to work, Nevarez and the jail's Lieutenant were waiting.

40. Plaintiff was again interviewed about the found pill, and warned that she must not withhold any information. Plaintiff again said she had no knowledge about the found pill. Plaintiff had the distinct feeling that she was under a cloud of suspicion for something she hadn't done.

41. On May 2, Plaintiff noticed that the same error that she had experienced with Mr. Doe had occurred with another nurse. A pill was recorded as signed out in the mistake-prone, unreliable EMR system. In fact, the medication had never been delivered to the inmate.

42. Concerned because she had received a final written warning due to this situation, Plaintiff nevertheless informed management of this recurring problem caused by the EMR system. Plaintiff received a terse email from Tina Nevarez stating the "incident will be investigated."

43. On May 8, 2019, Plaintiff was summoned to the HR Department and terminated, effective immediately. She was not given a reason for being fired. Plaintiff received a letter at home dated May 14, 2019, which gave the reason for her separation as "Involuntary: Performance and Behavior."

44. Despite diligent efforts over the past 12 months, Plaintiff has been unable to find comparable employment as a senior nurse. She teaches nursing part-time at a technical school in Sacramento.

45. As a result of being under suspicion, and then fired, Plaintiff suffered from emotional distress that manifested through physical symptoms such as depression, anxiety, digestive problems, insomnia, and eating disorders.

<u>Statutory Background</u>

46. The Health Insurance Portability and Accountability Act of 1996 [HIPAA] is the primary federal statute for the privacy of medical records. The federal

framework includes the Confidentiality of Alcohol and Drug Abuse Patient Records laws (42 CFR Part 2).

47. In California, comparable legislation was enacted with the Confidentiality of Medical Information Act (CMIA) (Civil Code § 56 et seq.)

48. California lawmakers recognize that the public interest is served when employees speak out at their jobs on topics of interest to the public. "[O]ur Legislature believes that fundamental public policies embodied in regulations are sufficiently important to justify encouraging employees to challenge employers who ignore these policies." *Green v. Ralee Engineering Co.* (1998) 78 Cal. 4th 66.

49. According to the American Public Health Association, "prisoner-patients should be provided the same privacy of health care information as patients in the community."[4]

50. The American Bar Association has published standards for health care of prisoners, including protections for the privacy and security of health information:

(a) Prisoners' health care records should:

(i) be compiled, maintained, and retained *in accordance with accepted health care practice and standards;*

(ii) not include criminal or disciplinary records unless a qualified health

---

[4] American Public Health Association Task Force on Correctional Health Care Standards. *Standards for Health Services in Correctional Institutions*. 3rd ed. Washington D.C. American Public Health Association, 2003-07.

care professional finds such records relevant to the prisoner's health care evaluation or treatment;

(iii) be maintained *in a confidential and secure manner*, separately from non-health-care files.[5]   (*emphasis added*)

51. The jail population is transient. On a national basis, only about 4% of jail admissions result in prison sentences; 96% of jail detainees and inmates return directly to their communities from jail. About 60% of the jail population turns over every week, with half of the jail population confined as a result of probation violation, parole violations or bond forfeitures.[6]

52. The migration between jails and communities has profound implications for an inmate whose medical privacy is breached. A prisoner may be under treatment for AIDS, HIV, hepatitis B, psychiatric disorders or other stigmatized conditions while incarcerated. Confidential information that is breached while serving jail time can be circulated in the community and damage the patient when he or she returns to everyday life.

*(continued next page)*

---

[5] American Bar Association, *Standards on Treatment of Prisoners* (2010): Standard 23-6.8 Health care records and confidentiality.www.americanbar.org/groups/criminal_justice/publications/criminal_justice_section_archive/crimjust_standards_treatmentprisoners/#23-6.8

[6] Melissa M. Goldstein, JD., *American Journal of Public Health*, "Health Information Privacy and Health Information Technology in the U.S. Correctional Setting," May 2014, Vol. 104, No. 5, Pg. 803.

# V. CAUSES OF ACTION

## FIRST CAUSE OF ACTION
Labor Code § 1102.5
(Whistleblower Protection)

53. Plaintiff incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

54. Defendant was Plaintiff's employer.

55. Defendant believed that Plaintiff might disclose to a government agency or a law enforcement agency, or another authority such as an accrediting agency, her conclusion that Placerville Jail's data security was inadequate, and that prisoners' confidential health records were vulnerable to breaches.

56. Plaintiff had reasonable cause to believe that Placerville Jail's new electronic medical records system failed to comply with generally-accepted standards for data and EMR security.

57. Defendant terminated Plaintiff.

58. Plaintiff's complaints, and her persistence in calling attention to the inadequate and error-prone data system, were contributing factors in her termination.

## SECOND CAUSE OF ACTION

Health & Safety Code § 1278.5

59. Plaintiff incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

60. Health & Safety Code § 1278.5 is a whistleblower protection law designed to encourage health care workers to notify authorities of "suspected unsafe patient care and conditions." (§ 1278, subd. (a). *Fahlen v. Sutter Central Valley*

*Hospitals,* 208 Cal.App. 4th 557, 560 (2012) The statute specifically says that nurses are protected by its provisions. *Id.* § 1278.5 was enacted in 1999 to prohibit certain forms of retaliation and discrimination against patients and employees of health facilities. (See Stats 1999, ch. 155 § 1, p. 2054).

61.     In 2007, § 1278.5 extended protections to any "member of the medical staff or any other health care worker of the health facility…." (§ 1278.5, subd. (b)(10, as amended by Stats. 2007, ch. 683, § 1, p. 5809*; Fahlen*, supra., 566-567.)

62.     In its relevant part, § 1278.5 pertains to health care workers who notify government entities of suspected unsafe patient care and conditions. The statute *also* protects employees who have "[p]resented a grievance, complaint, or report to the [health] facility…" Section 1278.5(b)(1)(A).

63.     On numerous occasions, Plaintiff presented complaints to her management, calling attention to the security lapses and data breaches at Placerville Jail, and how data privacy and standards of care were being compromised.

64.     Plaintiff was the target of retaliation because of her complaints.

65.     Plaintiff was terminated as the culmination of Defendant's retaliations against her complaints.

### THIRD CAUSE OF ACTION

Wrongful Termination in Violation of Public Policy

66.     Plaintiff incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

67.     Plaintiff was employed by Defendant.

68. Defendant terminated Plaintiff.

69. Plaintiff made persistent and outspoken complaints to management about Defendant's defective electronic medical records system. Her complaints were substantial motivating reasons for Plaintiff's termination.

70. The termination caused Plaintiff harm.

### FOURTH CAUSE OF ACTION
Intentional Infliction of Emotional Distress

71. Plaintiff incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

72. Defendant's conduct towards Plaintiff was outrageous.

73. Defendant intended to cause Plaintiff emotional distress, or, Defendants acted with reckless disregard of the probability that Plaintiff would suffer emotional distress.

74. Plaintiff suffered severe emotional distress.

75. Defendant's conduct was a substantial factor in causing Plaintiff severe emotional distress.

WHEREFORE, Plaintiff prays for relief as set forth below.

### VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. For lost wages, penalties and all other compensation denied or lost to Plaintiff by reason of Defendants' unlawful actions, in an amount to be proven at trial;

2. For compensatory damages for Plaintiff's emotional pain and suffering, in an amount to be proven at trial;

3. For punitive damages in an amount to be determined at trial;

4.     For liquidated damages;

5.     For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

6.     For her reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. § 2000e5(k), 42 U.S.C. § 1988, Cal. Gov't Code § 12965(b), Cal. Code Civ. Pro. § 1021.5, and other laws;

7.     For such other and further relief as this Court deems just and proper.

Dated: May 5, 2020
LAW PRACTICE OF DAVID GRAULICH

By:  _____/dg/_____
David Graulich, Esq.
Attorney for Plaintiff
AISLING CANNON

REQUEST FOR TRIAL BY JURY

Plaintiff AISLING CANNON hereby requests trial by jury.

Dated: May 5, 2020                              Respectfully submitted,

By:
_____/dg/_____
David Graulich, Esq.
Attorney for Plaintiff
AISLING CANNON